## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

SELECT SPECIALTY HOSPITALS, INC. D/B/A
SELECT SPECIALTY HOSPITAL - BIRMINGHAM
2010 Brookwood Medical Center Drive, 3rd Floor
Birmingham, AL 35209,

SELECT SPECIALTY HOSPITAL - ARIZONA, INC.
D/B/A SELECT SPECIALTY HOSPITAL – PHOENIX
350 West Thomas Road, 3rd Floor,
Phoenix, AZ 85013

SELECT SPECIALTY HOSPITAL - LITTLE ROCK/BMC,
INC. D/B/A SELECT SPECIALTY HOSPITAL -
LITTLE ROCK BMC
9601 Interstate 630, Exit 7, 10th Floor,
Little Rock, AR 72205,

SELECT SPECIALTY HOSPITAL - DENVER, INC.
D/B/A SELECT SPECIALTY HOSPITAL - DENVER
1719 East 19th Avenue, 5th Floor
Denver, CO 80218,

SELECT SPECIALTY HOSPITAL - WILMINGTON,
INC. D/B/A SELECT SPECIALTY HOSPITAL -
WILMINGTON
7th & Clayton Street, 5th Floor
Wilmington, DE 19805,

SELECT SPECIALTY HOSPITAL - GAINESVILLE, INC.
D/B/A SELECT SPECIALTY HOSPITAL – GAINESVILLE
2708 Southwest Archer Road,
Gainesville, FL 32608

SELECT SPECIALTY HOSPITAL - PENSACOLA, INC.
D/B/A SELECT SPECIALTY HOSPITAL - PENSACOLA
7000 Cobble Creek Drive,
Pensacola, FL 32504

SELECT SPECIALTY HOSPITAL - TALLAHASSEE,
INC. D/B/A SELECT SPECIALTY HOSPITAL -
TALLAHASSEE
1554 Surgeons Drive
Tallahassee, FL 32308,

Civil Action No. 1:19-cv-2591

**COMPLAINT FOR REVIEW
OF AGENCY ACTION**

SELECT SPECIALTY HOSPITAL - AUGUSTA, INC.
D/B/A SELECT SPECIALTY HOSPITAL - AUGUSTA
1537 Walton Way
Augusta, GA 30904,

REGENCY HOSPITAL COMPANY OF SOUTH
ATLANTA LLC D/B/A REGENCY HOSPITAL OF SOUTH
ATLANTA
1170 Cleveland Avenue, Suite 217,
East Point, GA 30344

REGENCY HOSPITAL COMPANY OF MACON, LLC
D/B/A REGENCY HOSPITAL OF CENTRAL GEORGIA
535 Coliseum Drive,
Macon, GA 31217

SELECT SPECIALTY HOSPITAL - SAVANNAH,
INC. D/B/A SELECT SPECIALTY HOSPITAL -
SAVANNAH
5353 Reynolds Street
Savannah, GA 31405,

SELECT SPECIALTY HOSPITAL - QUAD CITIES,
INC. SELECT SPECIALTY HOSPITAL - QUAD
CITIES
1111 West Kimberly Road
Davenport, IA 52806,

SELECT SPECIALTY HOSPITAL - BEECH GROVE,
INC. D/B/A SELECT SPECIALTY HOSPITAL -
INDIANAPOLIS
8060 Knue Road
Indianapolis, IN 46250,

SELECT SPECIALTY HOSPITAL - FORT WAYNE,
INC. D/B/A SELECT SPECIALTY HOSPITAL -
FORT WAYNE
700 Broadway, 7th Floor East
Fort Wayne, IN 46802,

SELECT SPECIALTY HOSPITAL - WICHITA, INC.
D/B/A SELECT SPECIALTY HOSPITAL - WICHITA
929 North St. Francis Street, 6th Floor North Tower
Wichita, KS 67214,

SELECT SPECIALTY HOSPITAL - LEXINGTON,
INC. D/B/A SELECT SPECIALTY HOSPITAL -
LEXINGTON
310 South Limestone Street, 3rd Floor
Lexington, KY 40508,

SELECT SPECIALTY HOSPITAL - KALAMAZOO,
INC. D/B/A SELECT SPECIALTY HOSPITAL - BATTLE
CREEK
300 North Avenue, 6th Floor
Battle Creek, MI 49017,

SELECT SPECIALTY HOSPITAL - SAGINAW, INC.
D/B/A SELECT SPECIALTY HOSPITAL - SAGINAW
1447 North Harrison Street, 7th and 8th Floors
Saginaw, MI 48602,

INTENSIVA HOSPITAL OF GREATER ST. LOUIS, INC.
D/B/A SELECT SPECIALTY HOSPITAL – ST. LOUIS
300 1st Capitol Drive, 1st Floor,
St. Charles, MO 63301

SELECT SPECIALTY HOSPITAL - GULF COAST,
INC. D/B/A SELECT SPECIALTY HOSPITAL - GULF
COAST
1520 Broad Avenue
Gulfport, MS 39501,

SELECT SPECIALTY HOSPITAL - JACKSON, INC.
D/B/A SELECT SPECIALTY HOSPITAL - JACKSON
5903 Ridgewood Road
Jackson, MS 39211,

REGENCY HOSPITAL OF MERIDIAN LLC D/B/A
REGENCY HOSPITAL OF MERIDIAN
1102 Constitution Avenue, 2nd Floor,
Meridian, MS 39301

SELECT SPECIALTY HOSPITAL - OMAHA, INC.
D/B/A SELECT SPECIALTY HOSPITAL - OMAHA
1870 South 75th Street
Omaha, NE 68124,

SELECT SPECIALTY HOSPITAL - NORTHEAST
NEW JERSEY, INC. D/B/A SELECT SPECIALTY
HOSPITAL - NORTHEAST NEW JERSEY
96 Parkway
Rochelle Park, NJ 07662,

SELECT SPECIALTY HOSPITAL - DURHAM, INC.
D/B/A SELECT SPECIALTY HOSPITAL - DURHAM
3643 North Roxboro Road
Durham, NC 27704,

SELECT SPECIALTY HOSPITAL - GREENSBORO, INC.
D/B/A SELECT SPECIALTY HOSPITAL – GREENSBORO
1200 North Elm Street, 5th Floor,
Greensboro, NC 27401

SELECT SPECIALTY HOSPITAL - WINSTON
SALEM, INC. D/B/A SELECT SPECIALTY
HOSPITAL - WINSTON SALEM
3333 Silas Creek Parkway
Winston-Salem, NC 27103,

SELECT SPECIALTY HOSPITAL - CINCINNATI,
INC. D/B/A SELECT SPECIALTY HOSPITAL -
CINCINNATI
375 Dixmyth Avenue, 15th Floor
Cincinnati, OH 45220,

REGENCY HOSPITAL OF TOLEDO LLC D/B/A
REGENCY HOSPITAL OF TOLEDO
5220 Alexis Road,
Sylvania, OH 43560

SELECT SPECIALTY HOSPITAL – TULSA/MIDTOWN,
LLC D/B/A SELECT SPECIALTY HOSPITAL –
TULSA/MIDTOWN
1125 South Trenton, 2nd and 3rd Floors
Tulsa, OK 74120,

SELECT SPECIALTY HOSPITAL - CENTRAL
PENNSYLVANIA, L.P. D/B/A SELECT SPECIALTY
HOSPITAL - CENTRAL PENNSYLVANIA
503 North 21st Street, 5th Floor
Camp Hill, PA 17011,

SELECT SPECIALTY HOSPITAL - DANVILLE, INC.
D/B/A SELECT SPECIALTY HOSPITAL - DANVILLE
100 North Academy Avenue, Bush Pavilion 3
Mail Stop 4210
Danville, PA 17822,

SELECT SPECIALTY HOSPITAL - ERIE, INC. D/B/A
SELECT SPECIALTY HOSPITAL - ERIE
252 West 11th Street
Erie, PA 16501,

SELECT SPECIALTY HOSPITAL - LAUREL
HIGHLANDS, INC. D/B/A SELECT SPECIALTY
HOSPITAL - LAUREL HIGHLANDS
1 Mellon Way, 3rd Floor
Latrobe, PA 15650,

SELECT SPECIALTY HOSPITAL - MCKEESPORT,
INC. D/B/A SELECT SPECIALTY HOSPITAL -
MCKEESPORT
1500 5th Avenue, Crawford, 6th Floor
McKeesport, PA 15132,

SELECT SPECIALTY HOSPITAL- PITTSBURGH/
UPMC, INC. D/B/A SELECT SPECIALTY HOSPITAL-
PITTSBURGH/UPMC
200 Lothrop Street, MUH E824
Pittsburgh, PA 15213,

REGENCY HOSPITAL COMPANY OF SOUTH
CAROLINA, LLC D/B/A REGENCY HOSPITAL OF
FLORENCE
121 East Cedar Street, 4th and 5th Floors,
Florence, SC 29504

SELECT SPECIALTY HOSPITAL - SIOUX FALLS,
INC. D/B/A SELECT SPECIALTY HOSPITAL -
SIOUX FALLS
800 E 21st St., Suite 300
Sioux Falls, SD 57105,

SELECT SPECIALTY HOSPITAL - TRICITIES, INC.
D/B/A SELECT SPECIALTY HOSPITAL - TRICITIES
1 Medical Park Boulevard, 5th Floor West
Bristol, TN 37620,

SELECT SPECIALTY HOSPITAL - KNOXVILLE,
INC. D/B/A SELECT SPECIALTY HOSPITAL -
KNOXVILLE
1901 Clinch Avenue, 4th Floor North
Knoxville, TN 37916,

SELECT SPECIALTY HOSPITAL - NASHVILLE,
INC. D/B/A SELECT SPECIALTY HOSPITAL -
NASHVILLE
2000 Hayes Street, Suite 500
Nashville, TN 37203,

SELECT SPECIALTY HOSPITAL - MEMPHIS, INC.
D/B/A SELECT SPECIALTY HOSPITAL - MEMPHIS
5959 Park Avenue, 12th Floor
Memphis, TN 38119,

SELECT SPECIALTY HOSPITAL - DALLAS, INC.
D/B/A SELECT SPECIALTY HOSPITAL - DALLAS
2329 Parker Road
Carrollton, TX 75010,

REHABILITATION INSTITUTE OF DENTON, LLC D/B/A
SELECT REHABILITATION HOSPITAL OF DENTON
2620 Scripture Street,
Denton, TX 76201

SELECT SPECIALTY HOSPITAL - CHARLESTON,
INC. D/B/A SELECT SPECIALTY HOSPITAL -
CHARLESTON
333 Laidley Street
Charleston, WV 25301,

SELECT SPECIALTY HOSPITAL - MADISON, INC.
D/B/A SELECT SPECIALTY HOSPITAL - MADISON
801 Braxton Place
Madison, WI 53715,

SELECT SPECIALTY HOSPITAL - MILWAUKEE, INC.
D/B/A SELECT SPECIALTY HOSPITAL – MILWAUKEE
2900 West Oklahoma Avenue,
Milwaukee, WI 53215

        Plaintiffs,

    v.

ALEX M. AZAR II, Secretary
United States Department of Health and Human Services
200 Independence Avenue, S.W.
Washington, DC 20201,

        Defendant.

## INTRODUCTION

1.     This case is about unpaid Medicare cost-sharing amounts ("bad debts") for patients at Plaintiffs' hospitals who were eligible for both Medicare and Medicaid ("dual eligible beneficiaries" or "dual eligibles"). The Defendant's fiscal intermediaries denied these bad debt amounts on Plaintiffs' annual Medicare cost reports, despite the fact that the Plaintiffs were unable to provide the *only* document the fiscal intermediaries would accept—a remittance advice ("RA") from the state Medicaid program showing that the Plaintiff billed Medicaid for the bad debt amount, the Medicaid claim was processed, and a payment determination was made by the state. The Plaintiffs cannot obtain Medicaid RAs because they were not enrolled or otherwise participating in the state Medicaid program at the time the services were rendered, and the states have no other mechanism to process bills from such health care providers ("providers"). In some states, the Plaintiffs *could not* enroll in Medicaid because, as long-term care hospitals ("LTCHs" or "LTACs"), they are not a recognized provider type.

2.     The fiscal intermediaries previously understood this and reimbursed the Plaintiffs for dual eligible bad debts without Medicaid RAs. The Plaintiffs relied on this practice of

allowing dual eligible bad debts without Medicaid RAs when the Plaintiffs admitted or continued to treat dual eligible beneficiaries during these years. However, the fiscal intermediaries abruptly began denying the Plaintiffs' bad debts, without formal notice, by applying the so-called "must-bill" policy of the Defendant's Centers for Medicare & Medicaid Services ("CMS"). When the fiscal intermediaries changed how they applied the must-bill policy with respect to the Plaintiffs, they made it *impossible* for the Plaintiffs to comply.

3.      In the first case brought by some of the Plaintiffs and other LTCHs in the same chain organization at Select Medical, this Court issued an opinion finding that this situation creates a "classic Catch-22" because the state Medicaid programs will not issue RAs in a form that CMS will accept and the Medicare providers either are not enrolled in Medicaid or in some states *cannot* enroll in Medicaid because, as LTCHs, they are not a recognized Medicaid provider type. **Exhibit B** at 25, *Cove Associates Joint Venture d/b/a Life Care Center of Scottsdale and Select Specialty Hospital-Denver et al. v. Sebelius*, 848 F. Supp. 2d 13 (D.D.C. 2012). The fiscal intermediaries all followed one policy and then around April 2007 imposed a different policy. The first policy exempted the Plaintiffs from the must-bill policy; the second policy imposed the must-bill policy on them. It was a complete reversal in the policy without prior notice, opportunity for comment, or regard for the inability of the Plaintiffs to comply.

4.      Recently, this Court issued a final decision in the same case and two other cases brought by many of these Plaintiffs and other Select Medical LTCHs for their Medicare cost reporting periods in fiscal years ("FYs") 2005 through 2010. The Court set aside and struck down in their entirety the agency's decisions. **Exhibit D**, *Select Specialty Hospital – Denver, Inc. v. Azar*¸ No. 10-cv-1356 (BAH), order (D.D.C. Aug. 22, 2019). Chief Judge Howell granted the plaintiffs' motion for summary judgment and denied the defendant's motion for summary

judgment because "CMS was required, under the Medicare Act, 42 U.S.C. § 1395hh(a)(2), to conduct notice-and-comment rulemaking before subjecting the plaintiffs, as non-Medicaid-participating providers, to the must-bill policy and the RA requirement." **Exhibit C** at 20-21, *Select Specialty Hospital – Denver, Inc. v. Azar¸* No. 10-cv-1356 (BAH), slip op. (D.D.C. Aug. 22, 2019).  The memorandum opinion determined that the United States Supreme Court's recent decision in *Azar v. Allina Services*, 139 S. Ct. 1804 (2019) "controls the outcome of this case and requires that CMS have conducted notice-and-comment rulemaking before applying the must-bill policy and the RA requirement to these LTCHs."  *Id.* at 21.  The Court remanded to the Administrator to promptly determine the amounts owed to the plaintiffs for their bad debts without applying the must-bill and RA requirements.  *Id*. at 27.

5.      The Plaintiffs have thoroughly documented their inability to obtain Medicaid RAs by submitting *hundreds* of *actual* bills to state Medicaid programs for the Medicare cost-sharing amounts at issue.  *Not one Medicaid RA has been issued in a form that CMS will accept.*  Faced with mounting losses, the Plaintiffs have since decided to enroll in Medicaid for only one reason—to be able to obtain Medicaid RAs in the future so that Medicare will reimburse their dual eligible bad debt claims.  *Yet, during the 2010-2011 timeframe when the Plaintiffs incurred the dual eligible bad debts at issue, seven states did not allow Plaintiffs to enroll in Medicaid: Alabama, Arkansas, Delaware, Mississippi (Harrison County), New Jersey, North Carolina, and Pennsylvania.*

6.      The fiscal intermediaries' insistence on applying the must-bill criteria under these circumstances and insistence on a "valid" Medicaid RA as the only acceptable documentation to allow dual eligible bad debts, even where states refuse to issue them, is inconsistent with prior audit treatment, was not preceded by notice to the Plaintiffs of the change for non-Medicaid-

participating providers, and amounts to a violation of the Medicare statute, 42 U.S.C. §§ 1395 *et seq.* (the "Medicare Act"), Medicare regulations and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.* For these reasons, and the other reasons discussed herein, the fiscal intermediaries' adjustments and denials of protested amounts for the Plaintiffs' dual eligible bad debts are legally invalid and should be reversed.

7.      The Plaintiffs received a final agency decision from the Provider Reimbursement Review Board ("PRRB" or "Board") on June 26, 2019, pursuant to which the Plaintiffs now file this Complaint. The PRRB's decision is attached hereto as **Exhibit A**. The PRRB reversed the fiscal intermediaries' adjustments that denied the Plaintiffs' dual eligible bad debts involving the following state Medicaid programs: Alabama, Delaware, Mississippi (Harrison County), New Jersey, and Pennsylvania. *Id.* at 14. This part of the PRRB decision is correct. Plaintiffs do not appeal or otherwise contest this part of the PRRB decision. However, the PRRB affirmed the fiscal intermediaries' adjustments denying the dual eligible bad debts involving the following states: Arkansas, California, Colorado, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Michigan, Mississippi (except for Harrison County), North Carolina, Ohio, Oklahoma, South Carolina, Tennessee, Texas, Virginia, and West Virginia (collectively, the "PRRB Denied Bad Debt States"). *Id.* at 13-14. The PRRB decision did not differentiate between bad debts for in-state dual eligibles versus out-of-state dual eligibles.

8.      As a result of the PRRB's decision, the Plaintiffs' dual eligible bad debts from the PRRB Denied Bad Debt States remain denied, decreasing the Plaintiffs' Medicare reimbursement for inpatient services rendered by Plaintiffs by approximately $997,143 total in their Medicare cost reporting periods ending in fiscal year ("FYs") 2011.

9.      By filing this Complaint, Plaintiffs request that the Court (i) reverse the PRRB's decision with respect to the PRRB Denied Bad Debt States and with respect to the Plaintiffs' out-of-state dual eligible bad debts because the PRRB's decision was invalid as a matter of law to apply the must-bill policy to non-Medicaid-participating health care providers and (ii) direct the Defendant to pay Plaintiffs the amount of their outstanding bad debts for dual eligible beneficiaries, plus interest, fees and costs.

## JURISDICTION AND VENUE

10.      This action arises under Title XVIII of the Social Security Act, as amended, 42 U.S.C. §§ 1395 *et seq.* (the "Medicare Act") and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*

11.      Jurisdiction is proper under 42 U.S.C. § 1395oo(f).

12.      Venue is proper in this judicial district under 42 U.S.C. § 1395oo(f)(1) and 42 C.F.R. § 405.1877(e)(2).

13.      This Court has authority to grant the relief requested under 42 U.S.C. § 1395oo(f).

## PARTIES

14.      During the 2011 fiscal period at issue herein, Plaintiffs were qualified as providers of hospital services under the federal Medicare Program pursuant to Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq*.  A list of the Plaintiff-hospitals with their Medicare provider numbers is included as **Exhibit E** and incorporated herein by reference.

15.      Defendant Alex M. Azar II ("Secretary") is the Secretary of the United States Department of Health and Human Services ("HHS") and is sued in his official capacity.  The Secretary is responsible for the administration of the Medicare program.  The Secretary exercises the administrative responsibility of the Medicare program primarily through CMS, an agency of

HHS.  The Secretary also contracts with private organizations to act as fiscal intermediaries (or "FIs," but now called Medicare Administrative Contractors, or "MACs") for Part A of the Medicare program.  Novitas Solutions, Inc. ("Novitas"), CGS Administrators ("CGS"), First Coast Service Options ("First Coast") and Palmetto GBA ("Palmetto") were the Medicare-contracted fiscal intermediaries to the Plaintiffs' hospitals during the relevant cost reporting periods.

## FACTUAL BACKGROUND

### I.     Medicare Payment for Long-Term Care Hospital Services

16.     The Medicare Act establishes a system of health insurance for the aged and the disabled.  The program is administered in two parts: Medicare Part A, which provides hospital insurance coverage to all qualified beneficiaries, and Medicare Part B, which provides medical insurance coverage for services such as physician's services, outpatient services, and home health care.  Participation under Part B is voluntary and beneficiaries must pay monthly premiums.

17.     Under Part A of the Medicare Act, an eligible Medicare beneficiary is entitled to have payment made by the Medicare Program on his or her behalf for, *inter alia*, inpatient hospital services provided to him or her by a hospital participating in the Medicare Program as a "provider of services."

18.     Pursuant to 42 U.S.C. § 1395cc, Plaintiffs entered into a written agreement with the Secretary to provide hospital services to eligible individuals.  CMS, through its fiscal intermediaries or MACs, pays hospitals participating in the Medicare program.  *See* 42 U.S.C. § 1395ww.  The amount of payment owed to a hospital for services furnished to Medicare

beneficiaries is determined by the fiscal intermediary or MAC acting as an agent of the Secretary. *See* 42 U.S.C. § 1395h.

19.     Under the Medicare program, different payment methodologies are used to reimburse different types of providers. The Medicare reimbursement system for LTCHs, the LTCH prospective payment system ("LTCH PPS"), is based on different levels of cost than the system applicable to general acute care hospitals. For general acute care hospitals, Medicare inpatient costs are reimbursed under the inpatient hospital prospective payment system ("IPPS") in which a hospital receives a fixed payment amount per discharge (adjusted for area wage differences) using Medicare-severity diagnosis related groups ("MS-DRGs"). The general acute care hospital DRG payment rate is based on the national average cost of treating a Medicare patient's condition in that type of facility. Although the average length of stay varies for each DRG, the average stay of all Medicare patients in a general acute care hospital is approximately six days. Thus, the prospective payment system for general acute care hospitals is not designed to reimburse hospitals on a regular basis for long-stay hospital care.

20.     For a hospital to be reimbursed under the LTCH PPS, it must have an average Medicare inpatient length of stay that is greater than twenty-five days, which reflects the medically complex cases treated in LTCHs. *See* 42 C.F.R. § 412.23(e)(2). Each patient discharged from an LTCH is assigned to a distinct Medicare-severity long-term care diagnosis-related group ("MS-LTC-DRG").[1]

21.     A LTCH is generally paid a predetermined fixed amount applicable to the assigned MS-LTC-DRG, adjusted for area wage differences. Most of the MS-LTC-DRGs for

---

[1] LTCHs are in the process of transitioning to a dual-rate payment system in which patient discharges that do not meet certain statutory patient criteria are paid a "site neutral" payment amount that is closer to the IPPS rate. However, the site neutral payment option is not relevant here because all of the cost reporting periods at issue ended before the transition period to the dual-rate payment system began on October 1, 2015. *See* 42 C.F.R. § 412.522.

LTCHs are the same as the MS-DRGs for general acute care hospitals, but the weights are generally higher to account for greater resources utilized for patient care in LTCHs and the longer length of patient stays.  Accordingly, the Federal standard rate has been much greater for LTCHs than for general acute care hospitals: $39,600 under the LTCH PPS in fiscal year 2011, compared to $6,044 under the IPPS in fiscal year 2011.

22.    Certain costs are excluded from the LTCH PPS and continue to be paid on the basis of reasonable cost, namely: bad debts, blood clotting factors, direct medical education, anesthesia services, and the cost of photocopying and mailing medical records requested by a Quality Improvement Organization.  *See* 42 C.F.R. § 412.521(b)(2).

## II.    Bad Debt and Reasonable Collection Efforts

23.    Medicare does not cover the full cost of medical care. Medicare beneficiaries are charged certain amounts for which they are liable. For example, a Medicare beneficiary is charged a fixed deductible amount when he or she receives Medicare-covered inpatient services in a hospital for the first time in a benefit period (*see* 42 C.F.R. § 409.82), and is charged an inpatient co-insurance amount for each day after the first 60 days of an inpatient stay for a benefit period (*see* 42 C.F.R.§ 409.83).

24.    Medicare regulations define "bad debts" as the "amounts considered to be uncollectible from accounts and notes receivable that were created or acquired in providing services. 'Accounts receivable' and 'notes receivable' are designations for claims arising from the furnishing of services, and are collectible in money in the relatively near future."  42 C.F.R. § 413.89(b)(1).  These debts include any unpaid Medicare deductibles and coinsurance obligations. *Id.* § 413.89(d).

25.    Medicare regulations entitle a hospital to reimbursement of these deductibles and co-insurance amounts by the Medicare program as "bad debts" if the hospital is not able to collect these amounts from the Medicare beneficiaries.  *See* 42 C.F.R. § 413.89.

26.    Federal regulations establish certain criteria for "allowable" bad debt (*i.e.*, bad debt that is reimbursable under Medicare) as follows: (1) the debt must be related to covered services and derived from deductible and co-insurance amounts; (2) the provider must be able to establish that reasonable collection efforts were made; (3) the debt was actually uncollectible when claimed as worthless; and (4) sound business judgment established that there was no likelihood of recovery at any time in the future.  *See* 42 C.F.R. § 413.80(e).  As long as the bad debt meets these criteria, a health care provider is entitled to Medicare reimbursement for the amounts.  *See* 42 C.F.R. § 413.89(d).

27.    A "reasonable collection effort" is defined as an effort similar to what a provider would make to collect accounts receivable from a non-Medicare beneficiary. *See* Provider Reimbursement Manual (CMS-Pub. 15-1) ("PRM-I") § 310.  Generally, CMS presumes that "reasonable collection efforts" are exhausted, and that the debt is uncollectible, if no payment has been received, the provider used reasonable and customary efforts to bill the beneficiary for the cost-sharing amounts, and it has been at least 120 days since the first bill was issued.  PRM-I § 310.2.

III.    **Collection Efforts for Dual Eligible Beneficiaries and the Must-Bill Policy**

28.    Providers are excused from pursuing reasonable and customary collection efforts if they can establish that the beneficiary is indigent and that "no other source other than the beneficiary would be legally responsible for the beneficiary's medical bill" such as the state Medicaid program.  PRM-I § 312.

29.     Dual eligible beneficiaries, who are eligible for both Medicare and Medicaid benefits under their state Medicaid program, are generally deemed to be indigent.  *Id.*  With respect to ensuring that no other sources of payment are available, if the state Medicaid program has a legal obligation to pay all, or any part, of the Medicare cost-sharing amounts, the amounts are not considered to be allowable bad debts under Medicare.  *See* PRM-I § 322.

30.     Medicaid is a joint federal-state health insurance program that is administered by the states under plans approved by the federal government.  State Medicaid programs are subject to requirements under both federal and state laws and regulations.  Although state Medicaid programs are administered separately from Medicare, the Social Security Act requires them to pay Medicare cost-sharing amounts for poverty-level Medicare beneficiaries, although the state may impose a payment ceiling.  *See* 42 U.S.C. §§ 1396a(n), 1396d(p)(3).  However, in general, state Medicaid programs will only process and pay bills submitted by providers that participate in that Medicaid program after completing the state's enrollment process.

31.     CMS developed a policy through sub-regulatory guidance that the Medicare bad debt regulation at 42 C.F.R. § 413.89 requires providers to bill Medicaid in order to confirm that the state will not pay the Medicare cost-sharing amounts on behalf of the dual eligible beneficiary.  This has become known as CMS's must-bill policy.

32.     Billing the state Medicaid program was not always required.  In fact, prior published instructions for filling out form HCFA-339 (Provider Cost Report Reimbursement Questionnaire) stated that, "it may not be necessary for a provider to actually bill the Medicaid program to establish a Medicare crossover bad debt where the provider can establish that Medicaid is not responsible for payment.  In lieu of billing the Medicaid program, the provider must furnish documentation of [Medicaid eligibility and non-payment that would have resulted

from billing Medicaid]."  Plaintiffs followed this documentation process and maintained records of proof of the patients' indigent status in support of their bad debt claims.

33.    In 2004, CMS explained the requirements under the must-bill policy.  According to CMS, for a provider to be reimbursed for allowable bad debt, the provider must-bill the state Medicaid program and the state Medicaid program must process and refuse to pay the claim.  CMS requires that this refusal to pay be in the form of a remittance advice (RA).  *See* CMS Joint Signature Memorandum ("JSM") 370 (Aug. 10, 2004).

34.    The policy of requiring an RA is inconsistent with prior published instructions for filling out form HCFA-339 (Provider Cost Report Reimbursement Questionnaire) which did not require RAs in situations where the provider could establish that Medicaid had no responsibility to pay the provider for the cost-sharing amounts.

35.    The policy of requiring a Medicaid RA as a condition of reimbursement for Medicare bad debt is also inconsistent with the fiscal intermediaries' prior practice and audit treatment of the Plaintiffs' dual eligible bad debt claims.  Prior to April 2007, the Defendant, acting through the fiscal intermediaries, did not require Plaintiffs, as non-Medicaid-participating providers, to bill the state, or obtain an RA, to be reimbursed for their dual eligible bad debt claims.  Rather, the fiscal intermediaries accepted documentation furnished by Plaintiffs as proof of the patients' indigent status for reimbursement of their dual eligible bad debt claims.

36.    Beginning in April 2007, the Defendant, acting through the fiscal intermediaries, abruptly changed its audit treatment of Medicare bad debts, citing the must-bill policy.  The fiscal intermediaries would not allow reimbursement of the Plaintiffs' Medicare bad debts without Medicaid RAs showing that the Plaintiff billed the state Medicaid program, the program

processed the bill, and the program made a payment determination.  Plaintiffs received no prior written notice of this change in policy or enforcement of that policy.

## IV.    Exceptions to the Must-Bill Policy

37.    The Defendant has recognized at least two exceptions to the must-bill policy.

38.    The first exception relates to community mental health centers ("CMHCs") in California.  CMHCs are not licensed by the state and therefore cannot enroll in the state Medicaid program ("Medi-Cal") or have their Medi-Cal claims processed.  The Secretary permits CMHCs to claim Medicare dual eligible bad debts without billing the state Medicaid agency.  As such, they are not subject to the reasonable collection efforts requirement of 42 C.F.R. § 413.89(e)(2) as enforced through the must-bill policy.

39.    The second exception to the must-bill policy relates to institutes for mental diseases ("IMDs") which are hospitals, nursing facilities or institutions that provide care for persons with mental diseases.  The Secretary permits IMDs to claim Medicare dual eligible bad debts without billing the state Medicaid agency when the services were provided to individuals age 22 to 64.  The rationale stated by the agency for permitting bad debt payment to IMDs without the prerequisite of billing Medicaid is that the Medicaid statute and the regulations preclude payment for IMD services provided to patients in this age group.  Therefore, the state has no responsibility to pay the cost-sharing amounts associated with those services and billing the state would be futile.

40.    As non-Medicaid-participating providers, it would have been impossible and futile for the Plaintiffs to bill the respective state Medicaid programs because the states had no mechanism to process Plaintiffs' Medicaid bills or issue RAs to Plaintiffs.  Similar to CMHCs and IMDs, the Plaintiffs were precluded under Medicaid laws and rules from receiving Medicaid

payment for their services. Therefore, the states had no legal responsibility to pay the cost-sharing amounts associated with those services.

41.    The Defendant's application of the must-bill policy to Plaintiffs, who were non-Medicaid-participating providers, or refusal to recognize an exception to the must-bill policy under these circumstances is arbitrary, capricious and inconsistent with existing policies which exempt certain providers from the must-bill policy in circumstances where billing the state would be futile or impossible.

## V.    Medicare Cost-Shifting Prohibition

42.    The Social Security Act ("SSA") prohibits the Medicare program from shifting Medicare costs for which beneficiaries are responsible, to non-beneficiaries (*i.e.*, "cost shifting"). *See* 42 U.S.C. § 1395x(v)(1)(A) (requiring the implementing regulations for reasonable cost reimbursement to "take into account both direct and indirect costs of providers of services . . . in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this title will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs . . . ."); 42 C.F.R. §§ 413.50; 413.89(d).

43.    For Part A-enrolled Medicare beneficiaries, who are responsible for paying Medicare coinsurance and deductible amounts (42 C.F.R. § 409.80(a)(2)), Medicare reimburses a provider where such amounts are uncollectible from the beneficiary. *See* 42 U.S.C. § 1395x(v)(1)(A)(i); 42 C.F.R. § 413.89(d). Failure to do so would result in inappropriate cost shifting and would violate the SSA.

44.    As such, the Medicare cost-shifting prohibition is specifically addressed in the Medicare regulations governing bad debt:

> Under Medicare, costs of covered services furnished beneficiaries
> are not to be borne by individuals not covered by the Medicare
> program, and conversely, cost of services provided for other than
> beneficiaries are not to be borne by the Medicare program.
> Uncollected revenue related to services furnished to beneficiaries
> of the program generally means the provider has not recovered the
> cost of services covered by that revenue. The failure of
> beneficiaries to pay the deductible and coinsurance amounts could
> result in the related costs of covered services being borne by other
> than Medicare beneficiaries. *To assure that such covered service
> costs are not borne by others, the costs attributable to the
> deductible and coinsurance amounts that remain unpaid are added
> to the Medicare share of allowable costs.*

42 C.F.R. § 413.89(d) (emphasis added); *see also* PRM-I § 304 ("Payment for deductibles and

coinsurance amounts is the responsibility of the beneficiaries. However the inability of the

provider to collect deductibles and coinsurance amounts from beneficiaries of the Program could

result in part of the costs of covered services being borne by others who are not beneficiaries of

the Program.").

45.     Applying the must-bill policy to non-Medicaid-participating providers violates the

cost-shifting prohibition and should be declared legally invalid.

**VI.    Bad Debt Moratorium**

46.     In 1987, Congress enacted the "bad debt moratorium" in response to proposed

Medicare program changes. *See* Omnibus Budget Reconciliation Act of 1987 ("OBRA '87"),

Pub. L. No. 100-203 § 4008, 101 Stat. 1330-55, as amended by the Technical Miscellaneous

Revenue Act of 1988 ("TMRA"), Pub. L. No. 100-647 § 8402, 102 Stat. 3798, and as further

amended by the Omnibus Budget Reconciliation Act of 1989 ("OBRA '89"), Pub. L. No. 101-

239 § 6023, 103 Stat. 2176 (codified as a note to 42 U.S.C. § 1395f (1992). Effective on August

1, 1987, the moratorium stated in relevant part that "In making payments to hospitals under [the

Medicare program], the Secretary of Health and Human Services shall not make any change in

the policy in effect on August 1, 1987, with respect to payment under [the Medicare program] to

providers of service for reasonable costs relating to unrecovered costs associated with unpaid deductible and coinsurance amounts incurred under [the Medicare program] (including the criteria for what constitutes a reasonable collection effort . . . and for determining whether to refer a claim to an external collection agency)." OBRA '87 § 4008.

47.    Congress subsequently amended the moratorium twice. First, with the TMRA in 1988, the moratorium was amended to further define "reasonable collection effort" by including "criteria for indigency determination procedures, for record keeping, and for determining whether to refer a claim to an external collection agency." TMRA § 8402. Second, in OBRA '89, Congress amended the moratorium by adding a sentence stating: "The Secretary may not require a hospital to change its bad debt collection policy if a fiscal intermediary, in accordance with the rules in effect as of August 1, 1987, with respect to criteria for indigency determination procedures, record keeping, and determining whether to refer a claim to an external collection agency, has accepted such policy before that date, and the Secretary may not collect from the hospital on the basis of an expectation of a change in the hospital's collection policy." OBRA '89 § 6023.

48.    Therefore, as amended, the bad debt moratorium places two limitations on CMS' treatment of bad debt policy. First, CMS cannot change its bad debt policy from the policy that was in effect on August 1, 1987. Second, CMS cannot require a provider to change the bad debt procedures that provider had in place on August 1, 1987.

49.    Since at least 1977, CMS policy and Medicaid law have allowed states to choose whether they will pay for dual eligibles' Medicare cost sharing amounts. *See* Action Transmittal, HCFA-AT-77-73 (MMB), CCH 1977 New Developments ¶ 28,590 (July 5, 1977) (entitled "Medicaid – Optional Payment of Medicare Part A Deductibles and Coinsurance"). When the

deductible and coinsurance amounts are not covered by the State under their Medicaid plan, these amounts may be reimbursed by Medicare as an allowable bad debt. *See id.* The change in CMS policy requiring Plaintiffs' non-Medicaid-participating hospitals to bill the state Medicaid programs is contrary to this pre-moratorium 1977 CMS policy and, therefore, also violates the bad debt moratorium.

## VII.    Medicare Cost Reporting and Appeals Process

50.     Fiscal intermediaries make interim payments to providers, subject to subsequent adjustments. *See* 42 U.S.C. § 1395(h).

51.     At the end of its fiscal year, each Medicare provider must submit a "cost report" showing the operating and capital-related costs incurred during the fiscal year and the appropriate portion of those costs to be allocated to Medicare. *See* 42 C.F.R. §§ 413.24, 413.50.

52.     The fiscal intermediary is then required to analyze and audit the cost report and to inform the provider of the fiscal intermediary's final determination of the amount of the provider's Medicare reimbursement for that cost reporting period. This final determination is known as the fiscal intermediary's Notice of Program Reimbursement ("NPR"). *See* 42 C.F.R. § 405.1803.

53.     A Medicare provider has the right to file a cost report under protest to preserve its right to appeal costs it asserts it is owed but has reason to believe that the fiscal intermediary will not allow under an interpretation of regulation or policy. *See Bethesda Hospital Ass'n v. Bowen*, 485 U.S. 399, 408 (1988) (holding that a provider may challenge the validity of a regulation after withholding amounts in a cost report through self-disallowance); Medicare Provider Reimbursement Manual (CMS-Pub. 15-2) ("PRM-II") § 115.

54.     If a provider is dissatisfied with its fiscal intermediary's final determination of its

Medicare program reimbursement for a particular cost reporting period, and if the provider meets the requirements set forth in 42 U.S.C. § 1395oo(a), the provider may appeal the intermediary's determination or NPR to the Provider Reimbursement Review Board ("PRRB" or "Board"). *See* 42 U.S.C. § 1395oo(a)(1)(A)(i).

55.     The PRRB is a five member administrative tribunal that sits in Baltimore, Maryland and decides disputes between Medicare providers and their fiscal intermediary over the amount of reimbursement owed by the Medicare program for services rendered to Medicare patients. *See generally* 42 U.S.C. § 1395oo.

56.     A hospital has a right to obtain a hearing before the PRRB by filing an appeal with the PRRB within 180 days of receiving its NPR.  42 U.S.C. § 1395oo(a)(1)(A)(i).  A group of commonly owned hospitals with a common issue can form a group appeal to the PRRB. *See* 42 U.S.C. § 1395oo(b); *see also,* 42 C.F.R. §§ 405.1837, 405.1839(b).

57.     The PRRB has the power to affirm, modify or reverse any determination of a fiscal intermediary with respect to a cost report and to make any other modification on matters covered by the cost report. See 42 C.F.R. § 405.1869.

58.     After the PRRB holds a hearing and issues its decision, the Administrator of CMS may review the Board's decision and may elect to reverse, affirm, or modify the decision of the PRRB, or vacate that decision and remand to the PRRB for further proceedings. *See* 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1875(e).

59.     The decision of the PRRB (or of the CMS Administrator if the Board's decision is reviewed by the Administrator) becomes the final determination of the Secretary, which is subject to judicial review pursuant to 42 U.S.C. § 1395oo(f) and 42 C.F.R. § 405.1877.

60.     Providers "have the right to obtain judicial review of any final decision of the Board, or any reversal, affirmance, or modification by the Secretary, by a civil action commenced within 60 days of the date on which notice of any final decision by the Board or of any reversal, affirmance, or modification by the Secretary is received." 42 U.S.C. § 1395oo(f)(1).

61.     This action can be brought in the United States District Court for the judicial district in which the provider is located, or alternatively in the United States District Court for the District of Columbia.

## VIII.    Relevant Facts and History of the FY 2005 Group Appeal and FYs 2006-2010 Group Appeals

62.     Preceding this FY 2011 group appeal, these and other Select providers appealed FY 2005 Medicare cost reports with disallowed dual eligible bad debts.  The appeal was filed by five providers located in Arkansas, Colorado, Delaware, Florida, and Louisiana, with an amount in controversy that totaled $438,693.  The adjustments were made by WPS and similarly dealt with beneficiaries that were dually eligible for both Medicare and Medicaid on their dates of service.  The fiscal intermediary issued notices of program reimbursement ("NPRs") beginning in July 2007, and the providers timely requested a group hearing before the PRRB on November 16, 2007.

63.     On August 20, 2008, the providers requested discovery from the fiscal intermediary by serving Requests for Production of Documents and Interrogatories.  The fiscal intermediary responded to the discovery requests on September 18, 2008.  The providers objected to the responses on the basis that they were incomplete by letter dated October 3, 2008.  The providers' requests were based on the providers' communications with the fiscal

intermediary during which the intermediary disclosed the existence of CMS communications relevant to the appeal.

64.    However, the communications from CMS that the fiscal intermediary referred to in written correspondence to the providers related to the change in audit treatment at issue in this appeal were not produced.  The fiscal intermediary, by letter dated October 20, 2008, responded that the alleged communications with CMS were verbal in nature and confirmed that *no written communications from CMS concerning the change in audit treatment exist.*

65.    A hearing was held on December 3, 2008 at which Wade Snyder, Reimbursement Director for Select Medical, testified on behalf of the providers.  The fiscal intermediary did not call any witnesses.  On April 13, 2010, the PRRB issued a unanimous decision reversing the intermediary's bad debt adjustments, holding: "The Intermediary's must bill policy has no foundation in law and is beyond the requirements of the regulations and manual.  Application of the must bill policy to dual-eligible bad debts when the Provider did not participate in Medicaid programs is improper."  On June 9, 2010, the CMS Administrator reversed and reaffirmed the fiscal intermediary's adjustments because the providers did not comply with the agency's must-bill policy.

66.    The providers timely appealed the Administrator's decision to this Court, filing a complaint dated August 12, 2010.  The providers contested that the must-bill policy—as applied to providers that do not or cannot participate in Medicaid—resulted in a violation of Medicare cost-shifting prohibitions, thereby compelling the court to reverse the Administrator's decision and set aside the fiscal intermediary's adjustments.  Additionally, the providers argued that (1) the must-bill policy was a new rule that failed to meet the notice and comment requirements of the APA, (2) the must-bill policy made substantive changes to an existing rule and violated the

notice and comment requirements of the Medicare Act, and (3) the Administrator's decision was

not supported by substantial evidence and should be set aside. Cross motions for summary

judgment were filed by the parties.

67.    On March 26, 2012, Judge Barbara Jacobs Rothstein issued an Order and

Memorandum of Law granting in part and denying in part the motions for summary judgment.

*See* **Exhibit B**.  Importantly, the court found that "CMS has not consistently enforced the must-

bill requirement against Plaintiffs . . . for all of Select Specialty's cost reporting periods prior to

fiscal year 2005, its FI reimbursed the facilities for dual-eligible bad debt without Medicaid RAs

[and p]rior to April 2007, the FI allowed proof of the beneficiary's indigence (here, dual eligible

status) as a sufficient basis for Medicare bad debt reimbursement." *Id.* at 12-13.  The court

stated that the new policy of applying the must-bill policy to non-Medicaid-participating

providers places them "in a classic Catch-22." *Id.* at 13.  The court did not invalidate the must-

bill policy itself, but the court determined that "CMS' enforcement of the must-bill policy to

Plaintiffs' claims may 'constitute a change that does not take [into] account [] legitimate reliance

on prior interpretation' and therefore may be arbitrary, capricious or an abuse of discretion." *Id.*

at 27.  The court remanded to CMS for reconsideration of whether these non-Medicaid-

participating providers were justified in relying on the agency's prior practice of not applying the

must-bill policy to their dual eligible bad debt claims.

68.    On remand, the CMS Administrator received written comments from the parties

to the FY 2005 group case but did not take any action until issuing a decision on March 21,

2016. The Administrator's decision on remand generally repeats the rationale of the earlier

decision and dismisses the providers' arguments and evidence that they reasonably relied on the

prior agency policy of not requiring non-Medicaid-participating providers to comply with the

must-bill policy.  As a result of the Administrator's Remand Decision, the providers' FY 2005

dual eligible bad debts remain denied.  The providers moved to reopen the case so that the Court

could complete its review of the providers' claims and issue a final decision on the merits.  The

Court granted the providers' motion and allowed for additional briefing.

69.    Some of the Plaintiffs and other Select providers then appealed the same issue for

FYs 2006 to 2010.  The providers began reporting their bad debts as protested items on the

Medicare cost report to preserve the issue for appeal and avoid any accusation of improper

billing.  The total amount in controversy in the FYs 2006 to 2010 appeals is approximately

$19,317,678.  The PRRB issued a partially favorable decision for the providers in the FY 2006 to

2010 appeals on September 27, 2016.  However, on November 29, 2016, the CMS Administrator

reversed the PRRB decision, except for the portion favoring the agency.  On February 2, 2017,

the providers in the FYs 2006 to 2010 appeal groups filed a complaint with this Court to

challenge the CMS Administrator's decision.  On January 16, 2019, this Court consolidated the

FY 2006 to 2010 case with the FY 2005 case.  *See* Minute Order, *Select Specialty Hospitals,*

*Inc., et al. v. Azar*, No. 17-cv-235, (D.D.C. Jan. 16, 2019) (Howell, C.J.).

70.    On August 22, 2019, Chief Judge Beryl A. Howell issued a Memorandum

Opinion granting the plaintiffs' motion for summary judgment in the consolidated cases for FYs

2005 through 2010.  *See* **Exhibit C.**  First, Chief Judge Howell found that "the must-bill policy

for reimbursement to LTCHs of bad debts for dual-eligible patients was not applied to any of the

plaintiffs, none of which were state-Medicaid-participating providers, for their claimed

reimbursements, until the Intermediaries issued the first NPRs at issue, in 2007, for fiscal year

2005." *Id.* at 7-8 (internal quotation marks omitted).  Chief Judge Howell then concluded that

CMS did not impose the RA requirement until the issuance of JSM-370 in 2004. *Id.* at 8.  Chief

Judge Howell also agreed with the PRRB that a JSM "is not an appropriate vehicle to set policy." *Id.* (internal quotation marks omitted). In addition, the Chief Judge examined the documentation in the administrative records and concluded that "[p]rior to April 2007 for *Select I* and *Select II* Plaintiffs . . . the CMS Intermediaries had not applied the must-bill policy and the concomitant RA requirement to the plaintiffs." *Id.* at 11. The documentation in the administrative records included "contemporaneous correspondence confirm[ing] that CMS's application of the must-bill and RA requirements to the plaintiffs beginning in 2007 was a change in policy." *Id.* at 12. Chief Judge Howell also found that in at least seven states (Alabama, Arkansas, Delaware, Mississippi (Harrison County), New Jersey, North Carolina, and Pennsylvania), the plaintiffs were unable to enroll in Medicaid. *Id.* at 16. In the remaining states, the memorandum opinion explained that the plaintiffs attempted to enroll in Medicaid "once they became aware of CMS's new policy requiring an RA," but the plaintiffs could not obtain RAs for earlier periods "leaving the plaintiffs holding the proverbial bag of unreimbursed bad debt." *Id.* at 16.

71.    Chief Judge Howell granted the plaintiffs' motion for summary judgment and denied the defendant's motion for summary judgment in the consolidated cases for FY 2005 through FY 2010 because "CMS was required, under the Medicare Act, 42 U.S.C. § 1395hh(a)(2), to conduct notice-and-comment rulemaking before subjecting the plaintiffs, as non-Medicaid-participating providers, to the must-bill policy and the RA requirement." **Exhibit C** at 20-21. The memorandum opinion said that the United States "Supreme Court's recent decision in *Azar v. Allina Services*, 139 S. Ct. 1804 (2019), controls the outcome of this case and requires that CMS have conducted notice-and-comment rulemaking before applying the must-bill policy and the RA requirement to these LTCHs." *Id.* at 21. "[W]hen CMS imposed the RA requirement, it changed a 'substantive legal standard'—state Medicaid participation—that the

LTCHs had to satisfy for reimbursement to occur, and CMS was required to conduct notice-and-comment rulemaking pursuant to § 1395hh(a)(2)." *Id.* at 26. Chief Judge Howell noted that in changing the must-bill policy "CMS created a *bureaucratic nightmare* by requiring a certain type of paperwork that the plaintiffs simply could not provide without sufficient advanced notice, and by obstinately continuing to deny reimbursement claims rather than working to find a reasonable solution in conjunction with the state Medicaid programs." *Id.* at 27 (emphasis added).

## IX.    Facts Specific to this Case

72.    The Plaintiffs are subsidiaries of Select Medical located in various states at the time the adjustments were made by the fiscal intermediaries: Novitas, CGS, First Coast, and Palmetto. With one exception, the Plaintiffs are Medicare-certified LTCHs. Plaintiff Select Rehabilitation Hospital of Denton is a Medicare-certified inpatient rehabilitation facility that did not participate in Medicaid.

73.    The adjustments at issue relate to bad debt amounts the Plaintiffs either claimed or protested on cost reports for FY 2011 for patients that were dually eligible for both Medicare and Medicaid on their dates of service (*i.e.*, dual eligibles).[2] All of these dual eligibles are obligated to pay Medicare coinsurance and deductible (referred to as "cost-sharing") amounts. The Plaintiffs incurred, and continue to incur, bad debts in the form of Medicare cost-sharing amounts as a result of providing health care services to dual eligibles.

74.    It is undisputed that, at the time the services were provided to dual eligibles, the Plaintiffs did not participate in their respective state Medicaid programs—a crucial fact which is

---

[2] Dual eligibles are individuals who are entitled to Medicare Part A and/or Part B and are eligible for some form of Medicaid benefit. There are different classes of dual eligibles (for example, Qualified Medicare Beneficiaries ("QMBs") qualify for Medicaid coverage of Medicare cost-sharing amounts but are not entitled to full Medicaid benefits); however, all of the dual eligibles at issue were eligible for some Medicaid coverage of their Medicare cost-sharing amounts. All dual eligibles, including QMBs, will therefore be referred to herein as "dual eligibles."

at the heart of the issue in these appeals.  Because state Medicaid programs do not allow non-Medicaid-participating providers to submit bills, and thus will not issue RAs showing processed bills to non-Medicaid-participating providers, the Plaintiffs were not able to bill and receive RAs from the applicable states.  Moreover, at the relevant times, the laws, regulations, and practices of certain states in which these Plaintiffs offer services did not permit LTCHs to enroll as Medicaid providers.

75.      Prior to April 2007, the fiscal intermediaries did not require Plaintiffs' hospitals to bill the state Medicaid program for Medicare cost-sharing amounts and obtain an RA from the state in order to be reimbursed for the bad debt by Medicare because the hospitals did not participate in Medicaid.  The Plaintiffs were exempted from the must-bill policy.

76.      In fact, prior instructions published by CMS for filling out form HCFA-339 (Provider Cost Report Reimbursement Questionnaire) provided that, where the provider could establish that Medicaid has no responsibility for payment, it could simply furnish documentation of Medicaid eligibility as proof of the non-payment that would have resulted from billing.

77.      The fiscal intermediaries settled almost all of the FY 2005 cost reports on this basis, allowing reimbursement of dual eligible bad debts based upon the Medicare beneficiaries' eligibility for Medicaid, without proof of billing the state or receiving Medicaid RAs.  The fiscal intermediaries sometimes proposed adjustments to dual eligible bad debts, but would not finalize these adjustments after the Plaintiffs furnished proof of Medicaid eligibility for the dual eligible beneficiaries.  Medicare reimbursed the dual eligible bad debts based upon the Medicare beneficiaries' eligibility for Medicaid, and therefore indigence, without proof of billing the state or receiving Medicaid RAs.

78.     However, in April 2007, the fiscal intermediaries abruptly changed their audit treatment of the Plaintiffs' dual eligible bad debts and denied all dual eligible bad debts without Medicaid RAs.  Citing the Medicare bad debt "must-bill" requirement, the fiscal intermediaries insisted that the requirement applies equally to both Medicaid-participating and non-participating hospitals.  The Plaintiffs were first verbally notified of this change in April 2007.  The intermediary then explained in an April 2007 email: "From this point forward, all providers, Medicaid certified or not, MUST bill the State and obtain a valid RA showing denied or partial payment before we allow the bad debt on the cost report."  The intermediary acknowledged in the same email that, previously, the CMS Kansas City Regional Office had clarified that "If a provider is not Medicaid certified, they shouldn't be required to bill the state before we allow the bad debt as the state does not have any liability to non-Medicaid-certified providers."

79.     The Plaintiffs received no advanced written notice of the policy change before April 2007, and thus had no opportunity to alter their cost reporting practice with regard to their dual eligible bad debts.  Significantly, no official public notice was *ever* issued by CMS that specifies the must-bill policy applies to Medicare providers who do not participate in Medicaid.

80.     After April 2007, the fiscal intermediaries continued to deny dual eligible bad debts for the FYs 2006, 2007, 2008, 2009 and 2010 cost reports, and the FY 2011 cost reports at issue in this case, under the must-bill policy.  For these years, the Plaintiffs reported their dual eligible bad debts as protested items on the Medicare cost reports to preserve the issue for appeal and avoid any accusation of improper billing.

## X.     Actual Bills Submitted to the State Medicaid Programs

81.     During the FY 2005 and FYs 2006 through 2010 group appeals, and again in the FY 2011 group appeal at issue here, the fiscal intermediaries and CMS repeatedly took the

position that if Plaintiffs simply submitted Medicaid bills to the states, they would get the

Medicaid RAs CMS wanted under the must-bill policy.

82.     During the summer of 2007, the Plaintiffs submitted actual bills to the Medicaid

programs in states where the Plaintiffs' hospitals were located or dual eligible beneficiaries

resided, but they did not receive any Medicaid RAs.  The Medicaid bills were accompanied by a

letter from the fiscal intermediary to Select Medical summarizing the Defendant's new policy for

requiring a Medicaid RA from the state before the fiscal intermediary will reimburse dual

eligible bad debts, regardless of whether the facility participates in the state Medicaid program or

not.  Plaintiffs submitted a total of 402 Medicaid claims in 20 states, including: Alabama,

Arkansas, Colorado, Delaware, Georgia, Iowa, Indiana, Illinois, Louisiana, Michigan,

Mississippi, North Carolina, Nebraska, New Jersey, Oklahoma, Pennsylvania, Tennessee, Texas,

Wisconsin, and West Virginia.  None of the states provided a Medicaid RA with a payment

determination.

83.     After Judge Rothstein's March 26, 2012 Order and Memorandum of Law in the

FY 2005 case, Plaintiffs submitted a second set of Medicaid bills, but this time they submitted

claims for *all* of the dual eligible cost sharing amounts at issue in the FY 2005 case to prove that

no Medicaid RAs would be obtained.  In total, 102 bills were sent in April 2012 for dual eligible

Medicare cost-sharing amounts to state Medicaid programs in Arkansas, Colorado, Delaware,

Florida, Louisiana, and Oklahoma.  Plaintiffs included a letter with these bills summarizing the

purpose of the bill submission and a copy of the Court's March 26, 2012 Order.  The Plaintiffs

also undertook extensive efforts to contact these states via telephone to find out if RAs could be

obtained.  Responses from the states were varied, but no RAs with payment determinations were

received.

84.      In 2013, the Plaintiffs also submitted actual Medicaid bills for the dual eligible Medicare cost-sharing amounts at issue in the FYs 2006 through 2010 appeals to each state where their hospitals are located, as well as other states where their dual eligible patients reside. Plaintiffs included a cover letter asking each state Medicaid program to either process the claims and issue an RA or respond that the claims cannot be processed because the hospital did not participate in Medicaid on the dates of service in question.  After submitting the claims, Plaintiffs followed up on the status of the claims by telephone, mail, and/or e-mail.  As with the previous attempts to bill Medicaid, the Plaintiffs did not receive *any* Medicaid RAs showing a processed claim with a payment determination.  The 23 states that were billed include:  Alabama, Arkansas, Colorado, Delaware, Florida, Georgia, Indiana, Illinois, Iowa, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Nebraska, New Jersey, North Carolina, Oklahoma, Pennsylvania, Tennessee, Texas, West Virginia, and Wisconsin.

85.      In 2017, the Plaintiffs sought to test the agency's assertion that all states now process Medicaid claims for Medicare cost-sharing amounts, even if the provider is not enrolled in Medicaid.  The Plaintiffs located in the three states that still would not enroll LTCHs in Medicaid at that time (*i.e.*, Delaware, Mississippi (Harrison County), and New Jersey) submitted bills for dual-eligible cost sharing amounts to see if these states would issue RAs.  Some claims automatically crossed over from Medicare to Medicaid for payment.  If the claim did not automatically crossover to Medicaid, the Plaintiff submitted a hard copy claim to Medicaid for payment.  The Plaintiffs followed up on the status of the claims by telephone with the states' Medicaid customer service.  The Plaintiffs did not receive any RAs specifically showing that Medicaid processed the claims and denied payment.

86.     More recently, the Plaintiffs undertook an additional effort to submit actual claims to the state Medicaid programs for the Medicare cost sharing amounts at issue in this FY 2011 appeal.  The Plaintiffs selected a random sample of 44 actual claims from the total number of claims associated with the bad debts in this FY 2011 appeal.  The Plaintiffs submitted electronic or paper claims for the Medicare cost sharing amounts to these state Medicaid programs.  Thirty-three of the claims also crossed over automatically from the Medicare program.  This billing effort included the submission of claims to the state Medicaid programs where the Plaintiffs' LTCHs are located, as well as claims submitted to out-of-state Medicaid programs.  After submitting the claims, the Plaintiffs followed up on the status of the claims by telephone if they did not get a response in writing.  The Plaintiffs received *not one* Medicaid RA showing a processed claim with a payment determination.

87.     Sixty-Four (64) percent of the Medicare claims for dual eligibles at issue in this FY 2011 appeal automatically crossed over from Medicare to the state Medicaid programs for payment of the Medicare cost sharing amounts.  The amounts that crossed over to Medicaid equal 71 percent of the amount in controversy in this appeal.  However, the states did not issue any Medicaid RAs for these crossover claims.

88.     Automatic crossover of claims to state Medicaid programs did *not* require any action by the Plaintiffs.  Automatic crossover only required actions by the Medicare and Medicaid agencies.

89.     In all of these efforts to bill the state Medicaid programs, instead of RAs specifically showing that Medicaid had processed and denied the claim, these states provided written confirmation that the claims could not be recognized or processed and that the state had no liability for the claims.  The states offered various reasons: the hospital was not enrolled in

Medicaid; the hospital was not enrolled in Medicaid at the time the services were provided; the hospital could not be enrolled in Medicaid because LTCHs were not an approved Medicaid provider-type; or a similar response.  In *no* case did *any* state provide an RA of a processed claim.

90.     Therefore, the Plaintiffs have thoroughly demonstrated that they are unable to obtain Medicaid RAs for these claims with payment determinations.  Despite all of the billing efforts and follow-up communications detailed in the Plaintiffs' extensive documentation in the administrative record, the Plaintiffs received no Medicaid RAs with a payment determination in return—not one.  As such, for FY 2011, the Plaintiffs have shown, without question, that the state Medicaid programs will not reimburse dual eligible Medicare cost sharing amounts for their patients or issue RAs denying such reimbursement.  Accordingly, the Plaintiffs properly submitted Medicare cost reports identifying those amounts for reimbursement by Medicare as bad debts.

## XI.    Plaintiffs' Administrative Appeal of Dual Eligible Bad Debts Denied by Medicare for FY 2011

91.     Beginning June 21, 2012, Novitas began issuing NPRs to the Plaintiffs' hospitals for their FY 2011 Medicare cost reports, adjusting the bad debts at issue and citing the must-bill policy.  On December 4, 2012, the Plaintiffs timely requested a group hearing before the PRRB.  Additional Plaintiff hospitals were subsequently added to the group.  The appeal group for FY 2011 consists of 48 hospitals located in the following states: Alabama, Arizona, Arkansas, Colorado, Delaware, Indiana, Iowa, Florida, Georgia, Kansas, Kentucky, Michigan, Mississippi, Missouri, Nebraska, New Jersey, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, West Virginia, and Wisconsin.

92.     On March 23, 2017, the Plaintiffs notified the PRRB that the groups were complete.  By notice dated August 3, 2017, the PRRB issued a Notice of Hearing and Critical Due Dates letter.  The parties filed position papers with the PRRB.  Prior to the PRRB's decision, the total amount in controversy for this FY 2011 appeal was approximately $1,927,750.

## XII.    Decision of the Provider Reimbursement Review Board

93.      At the administrative level, the issue before the PRRB was whether the CMS must-bill policy applies to the Plaintiffs' dual-eligible bad debts when the Plaintiffs did not participate in the Medicaid program.

94.     After a hearing held on April 19, 2018, the PRRB issued a decision on June 26, 2019 that was partially favorable to the Plaintiffs.  The PRRB reversed the fiscal intermediaries' dual eligible bad debt adjustments that pertain to dual eligible bad debt claims associated with states where the Medicaid program would not enroll LTCHs, and remanded those cost reports back to the fiscal intermediaries to determine the appropriate amount of bad debt reimbursement.

95.     Specifically, the PRRB determined that the Plaintiffs were unable to enroll in the state Medicaid programs in Alabama, Delaware, Mississippi (Harrison County), New Jersey, and Pennsylvania because these states did not recognize and did not reimburse LTCHs.  The PRRB found that "[t]his is similar to the exception to the must bill policy that CMS recognized for CMHCs in the *Monterey* case."  **Exhibit A** at 11 (referring to *Community Hospital of Monterey Peninsula v. Thompson*, 323 F.3d 782 (9th Cir. 2003)).  The PRRB then agreed with this Court, stating that these Plaintiffs are caught in a Catch-22 which prevents their ability to comply with the must-bill policy:

> Moreover, the Select LTCHs are clearly caught in a "Catch-22," as identified by the D.C. District Court in 2012 in *Cove Assocs. Joint Venture v. Sebelius ("Cove")*.  Like the LTCHs in Cove, the Select LTCHs were told to comply with the Medicare "must bill" policy even though they were unable to do so because

billing privileges for these state Medicaid programs were contingent on enrollment in those programs and, as LTCHs, they could not enroll in the relevant state Medicaid programs. Consistent with the *Cove* Court rationale, the Select LTCHs "are left in the untenable position of either refusing to treat dual-eligible patients or absorbing the bad debt associated with those patients."

In *Cove*, the Secretary's position was that "states are required to issue RAs (regardless of a provider's participation status)" although the agency's counsel conceded "it was in a better position than the providers to ensure that the states comply." However, the *Cove* Court was "not willing to place a stamp of judicial approval on a policy that would put non-participating providers in the position of not being paid due to the delinquency of federally-funded state programs." Neither is the Board.

Based on *Cove*, the Board finds that the Medicare Contractors improperly disallowed bad debt reimbursement for the claims at issue involving the States Not Allowing LTCH Enrolment.  Accordingly, the Board remands the claims involving States Not Allowing LTCH Enrollment to the Medicare Contractors to determine the appropriate amount of bad debt reimbursement for those claims.

**Exhibit A** at 11-12 (internal footnotes omitted).

96.     The PRRB also affirmed the fiscal intermediaries' dual eligible bad debt adjustments with respect to Plaintiffs' dual eligible bad debt claims associated with the remaining states: Arkansas, California, Colorado, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Michigan, Mississippi (except for Harrison County), North Carolina, Ohio, Oklahoma, South Carolina, Tennessee, Texas, Virginia, and West Virginia.  The PRRB believed that the Plaintiffs could have enrolled in these state Medicaid programs, although the PRRB acknowledged the Plaintiffs' efforts to bill these state Medicaid programs, which did not result in any Medicaid RAs with a payment determination.

97.     Except for recognizing that approximately 25 percent of the bad debt amounts at issue relate to out-of-state Medicaid programs, the PRRB decision did not address the Plaintiffs' arguments regarding dual eligible bad debts claimed for out-of-state beneficiaries.  This issue was fully briefed in the Plaintiffs' Reply Brief and Post-Hearing Brief, documented in the Plaintiffs' exhibits, and discussed at the PRRB hearing.

## XIII.  No Decision from the CMS Administrator

98.     On July 26, 2019, the CMS Office of the Attorney Advisor provided notice that the CMS Administrator would review the PRRB decision, after the fiscal intermediary requested Administrator review and the CMS Chronic Care Policy Group submitted a letter with its comments to the PRRB decision.  On August 12, 2019, the Plaintiffs submitted a letter to the Office of the Attorney Advisor with their comments to the PRRB decision.  The Plaintiffs requested that the Administrator: (1) affirm the portion of the PRRB decision that reversed the Medicare Contractors' dual eligible bad debt adjustments related to states where the Medicaid program would not enroll LTCHs (*i.e.*, Alabama, Delaware, Mississippi (Harrison County), New Jersey and Pennsylvania), with the modification that it also applies to Arkansas and North Carolina; (2) reverse the portion of the PRRB decision that affirmed the Medicare Contractors' dual eligible bad debt adjustments related to the remaining states; and (3) modify the PRRB decision to clarify that the Medicare Contractors' dual eligible bad debt adjustments are reversed for out-of-state beneficiaries.

99.     As of the date of filing this Complaint, the CMS Administrator has not issued a decision.  Since it has been more than 60 days since the Plaintiffs received the PRRB decision on June 26, 2019, the Administrator's "inaction constitutes an affirmation of the Board's decision by the Administrator, for purposes of the time in which to seek judicial review."  42 C.F.R. § 405.1877(b)(4) (judicial review must be requested within 60 days after the expiration of the 60-day period for a decision by the Administrator).  Thus, the PRRB decision is the subject of the Court's review.

## XIV.  The PRRB's Decision is Invalid and Should be Reversed

100.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 99 above as if fully stated herein.

101.    The PRRB's decision is reviewable by this Court pursuant to the provisions of the Medicare Act, 42 U.S.C. § 1395oo(f), and the APA, 5 U.S.C. § 706.  The PRRB's decision with respect to the Plaintiffs' dual eligible bad debts related to the PRRB Denied Bad Debt States and Plaintiffs' out-of-state dual eligible bad debts is inconsistent with and unauthorized by the governing Medicare statute, regulations and manual provisions, is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, is unsupported by substantial evidence, and violates the APA and Medicare program's notice and comment rulemaking requirements, for the following reasons, among others:

a.    CMS's change in the must-bill policy, or new interpretation or enforcement of the must-bill policy, which beginning in April 2007 suddenly required Plaintiffs' non-Medicaid-participating providers to bill states for dual eligible Medicare cost sharing amounts and obtain Medicaid RAs prior to submitting those costs for payment by Medicare as bad debt claims, was arbitrary, capricious and an abuse of discretion under the APA, 5 U.S.C. § 706(2)(A) and unsupported by substantial evidence pursuant to the APA, 5 U.S.C. § 706(2)(E).

b.    The PRRB's decision that requires Plaintiffs to bill the state Medicaid program and obtain Medicaid RAs in order to demonstrate its reasonable collection efforts for Medicare bad debts reimbursement is arbitrary and capricious since Plaintiffs do not participate in the state Medicaid program (and in some states they cannot participate in the state Medicaid program) and there is no mechanism for Medicaid to process Plaintiffs' bills and issue Medicaid RAs.

c.    The PRRB's decision incorrectly concluded that the must-bill policy applies to the Plaintiffs dual eligible bad debts related to the PRRB Denied Bad Debt

States, despite the fact that the Plaintiffs did not participate in these state Medicaid programs. Just like the Plaintiffs' bad debts for the states where the PRRB reversed the fiscal intermediaries' adjustments, the Plaintiffs were in a "classic Catch-22" for the PRRB Denied Bad Debt States because, as non-Medicaid-participating providers, the state Medicaid programs will not issue RAs in a form that CMS will accept and the Medicare providers either are not enrolled in Medicaid or in some states cannot enroll in Medicaid because, as LTCHs, they are not a recognized Medicaid provider type. The Plaintiffs' primary purpose is to provide necessary medical care to extremely sick patients, and based on a strained and misguided interpretation of the regulations, CMS has forced the Plaintiffs to absorb costs for necessary care to a subset of indigent beneficiaries.

      d.     CMS's change in the must-bill policy or change in enforcement of the must-bill policy to Plaintiffs' dual eligible bad debt claims was a "[s]udden and unexpected change or change that does not take account of legitimate reliance on prior interpretation" and therefore is arbitrary, capricious or an abuse of discretion. *Smiley v. Citibank*, 517 U.S. 735, 742 (1996).

      e.     The PRRB erroneously permitted CMS to retroactively apply the must-bill policy to Plaintiffs without prior notice. Contrary to the treatment of Plaintiffs' dual eligible bad debts in prior cost reporting periods, the fiscal intermediaries abruptly began applying the must-bill policy when auditing some of the Plaintiffs' FY 2005 cost reports. CMS did not provide any notice to Plaintiffs before this abrupt change, and CMS did not take into account the Plaintiffs' legitimate reliance on the agency's longstanding practice of not applying the must-bill policy to non-Medicaid-participating providers.

f.      The PRRB's decision is arbitrary and capricious because it is an unexplained departure from CMS' prior treatment of Plaintiffs' dual eligible bad debts before April 2007.

g.      The evidence in this case established that the Plaintiffs did, in fact, meet all Medicare statutory and regulatory requirements, and follow the manual provisions for reimbursements of dual eligible bad debt claims, and the PRRB erred in finding to the contrary with respect to the Plaintiffs' bad debts related to the PRRB Denied Bad Debt States.

h.      The PRRB's decision erroneously held that the must-bill policy is applicable to Plaintiffs' bad debt claims related to the PRRB Denied Bad Debt States, where the Plaintiffs did not participate in Medicaid, despite the fact that no Medicare statute, regulation or manual provision requires that the Plaintiffs enroll in Medicaid or bill the states and obtain an RA prior to submitting their bad debt claims.

i.      The PRRB's decision is not in accordance with the rule that Medicaid participation is voluntary and is not a prerequisite to receiving Medicare reimbursement.

j.      The PRRB's decision refuses to allow Plaintiffs to submit proof of beneficiaries' indigence to support the Plaintiffs' claimed bad debts when the Plaintiffs have no ability to force the states to process claims from non-Medicaid-participating providers.

k.      The PRRB's decision finds that the must-bill policy applies without exception to the Plaintiffs' dual eligible bad debts related to the PRRB Denied Bad Debt States, yet the decision acknowledges that CMS makes two exceptions to the must-bill policy for IMDs and CMHCs, but erroneously does not address whether an exception

should apply to the Plaintiffs, who do not participate in the state Medicaid programs of the PRRB Denied Bad Debt States.

l.      The PRRB's decision is arbitrary and capricious because the CMS must-bill policy requires providers to enroll in every state Medicaid program in the country. LTCHs frequently treat out-of-state beneficiaries.  To ensure that Medicare will reimburse all dual eligible bad debts, including bad debts from out-of-state Medicaid beneficiaries, Plaintiffs would need to enroll in every state Medicaid program to comply with the must-bill policy.

m.     Even if the must-bill policy is an interpretive rule, the change in the must-bill policy, or change in the interpretation or enforcement of the must-bill policy, that the PRRB's Decision upholds with respect to the PRRB Denied Bad Debt States, still fails to comply with the reasonableness test of the arbitrary and capricious standard under § 706(2)(A) of the APA because CMS abruptly changed the must-bill policy and did not take into consideration Plaintiffs' legitimate reliance on the previous policy, which exempted Plaintiffs' dual eligible bad debt claims because Plaintiffs were not enrolled in Medicaid.  In addition, CMS failed to comply with the notice and comment rulemaking procedures for interpretative rules required by the Medicare Act.  42 U.S.C. § 1395hh(a)(2).

n.      The PRRB's decision violates the cost-shifting prohibition under the Medicare Act, 42 U.S.C. § 1395x(v)(1)(A)(i) and Medicare bad debt regulation, 42 C.F.R. § 413.89(d), by shifting the Medicare cost sharing amounts for dual eligibles to Plaintiffs.

o.      The PRRB's decision violates the bad debt moratorium under the

Medicare Act, 42 U.S.C. § 1395f note, which prevents CMS from changing policies, or requiring a provider to change policies, regarding bad debts that were in effect as of August 1, 1987.

102.    The PRRB's decision injured the Plaintiffs in the amount of their denied bad debt claims for dual eligible beneficiaries in the PRRB Denied Bad Debt States during the relevant periods, which total approximately $997,143, before interest, fees and other costs.

## PRAYER FOR RELIEF

**WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:**

103.    For an order reversing the PRRB's decision in this case with respect to the Plaintiffs' dual eligible bad debts related to the PRRB Denied Bad Debt States and the Plaintiffs' dual eligible bad debts related to out-of-state dual eligibles, and requiring the Secretary to reimburse Plaintiffs for these dual eligible bad debts for the cost reporting periods at issue, which in the aggregate total approximately $997,143, before interest, fees and other costs;

104.    That the Court award Plaintiffs prejudgment interest to which they are entitled to as a matter of right under 42 U.S.C. § 1395oo(f)(2);

105.    That the court award Plaintiffs' costs and legal fees; and

106.    That the Court grant to Plaintiffs such other and further relief that the Court deems proper.

Dated: August 27, 2019

Respectfully submitted,

 /s/ *Jason M. Healy*
Jason M. Healy (D.C. Bar No. 468569)
THE LAW OFFICES OF
JASON M. HEALY PLLC
1701 Pennsylvania Ave., N.W.
Suite 300

Washington, DC 20006
(202) 706-7926
(888) 503-1585 (fax)
jhealy@healylawdc.com

*Attorney for Plaintiffs*